Filing

1  **Charles R. Estes, (PRO-SE)**
   **650 Murray Hill Road**
2  **Hill, New Hampshire, 03243**
   **Ph.925-785-7003**
3  **CharlesEstes@OEM-Tech.com**
   **CHARLES R. ESTES. d.b.a.**
4  **OEM-TECH, a California sole proprietorship.**
5

**FILED**

FEB - 7 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6              **UNITED STATES DISTRICT COURT**

7        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

8

9  CHARLES R. ESTES d.b.a. OEM-        ) **CASE NO.: 3:10 cv 04368-RS**
   Tech, a California sole proprietor-    )
10 ship.                                  )
                                          ) **THIRD AMENDED COMPLAINT**
11        Plaintiff,                      ) **FOR DAMAGES FOR:**
                                          )
12   vs.                                  )
                                          )
13 VIDEO GAMING TECHNOLOGIES,             ) **(1) Breach of Oral Contract**
   INC. a Corporation doing business in  )
14 California as VGT, INC, and DOES 1-    ) **(2) Breach of the Covenant of**
   50, Inclusive,                         ) **Good Faith and Fair Dealing**
15        Defendants.                     )
                                          ) **(3) Detrimental Reliance**
16                                        )
17                                        )
                                          )
18                                        ) **REQUEST FOR JURY TRIAL**
                                          )
19                                        )
   _____       )
20

21        Plaintiff CHARLES R. ESTES d.b.a. OEM-TECH, ("OEM"), a California

22 Sole Proprietorship which is owned and operated by Charles Estes hereby files

23 this Complaint against defendants Video Gaming Technologies, Inc, which is

24 doing business in California as VGT, Inc. ("VGT"), and DOES 1-50, and alleges

25 as follows:

**INTRODUCTION**

1.      Plaintiff Charles Estes d.b.a. OEM-Tech ("OEM") designs, engineers, sells, manufactures and directly distributes flash storage memory devices. OEM is a distributor of products often called, or referred to as, DiskOnModule® or "DOM" Solid State Devices and Flash Media Storage Devices. This includes supplying customers with commercial and industrial NAND Flash Storage devices, which are often used to replace standard rotary hard-drives in updating equipment such as Gaming Machines, Point of Sales (POS) Systems and Kiosk Machines such as bank ATMs and self check-in airport Kiosks.

2.      Defendant VIDEO GAMING TECHNOLOGIES, INC. ("VGT") is one of the leading manufacturers of gaming machines for lease to casinos in the United States. This includes manufacturing games for the Class II gaming market often found in Native American casinos and Class III games found typically in Las Vegas, Atlantic City and Internationally.

**JURISDICTION AND VENUE**

3.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332(a) because the matter in controversy is between citizens of different States, and the amount in controversy exceeds $75,000.00.

Pursuant to 28 U.S.C. § 1441(a) Defendant removed this action from state court to district court. The Venue in this district is proper due to 28

U.S.C. § 1446(a) because this is the district in which the action was pending in state court.

## PARTIES

4.     Plaintiff Charles R. Estes, d.b.a. OEM-TECH ("OEM") with its principal place of business in the City of Brentwood, County of Contra Costa, and a citizen of California.

5.     Defendant VIDEO GAMING TECHONOLOGIES, INC. is a corporation with offices in Tennessee, Oklahoma and Virginia, doing business in California, as VGT, INC. ("VGT"). VGT represents itself as one of the leading manufacturers of Class II and Class III gaming machines in the United States and Internationally. VGT publically trumpets itself as having record-setting gaming revenues, and claims its unbeatable formula for success has been achieved by constantly refining its games. VGT acknowledges that as a Class II & Class III gaming manufacturer, it is only as popular as its best-performing game: companies that don't innovate, says VGT, get left behind.

6.     The true names or capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as Does 1 through 100 are unknown to plaintiff, who therefore sues said defendants by such fictitious names, and plaintiff will amend this complaint to show their true names and capacities when the same have been ascertained.

>

## SUMMARY STATEMENT

1
2
3
4
5
6

7.     At the behest of Video Gaming Technologies, Inc. (VGT), plaintiff OEM was selected by VGT to design, and then deliver, a unique electronic flash storage device, which VGT wanted so as to improve its game functionality and corporate profitability. OEM agreed to develop and deliver a new device to VGT.

7
8
9
10
11
12
13
14
15
16
17
18
19

8.     On July 17, 2008, the two parties entered into a design and deliver agreement. OEM, confident it could and would design and deliver devices specified by VGT to meet its requirements, devoted many months and thousands of dollars to achieve VGT's goal of innovation through product development. Despite defendant's continued reassurances of its commitment, despite continued reaffirmation to purchase a total of not less than some 30,000 device "kits", and despite OEM's actual design and delivery of this functioning and certified flash storage device, defendant VGT capriciously but purposefully decided to repudiate the agreements, decided to refuse to purchase the amounts agreed to, and further decided to conspire and partner with other third parties to circumvent the design and deliver agreement established between the parties.

20
21
22
23
24

9.     OEM now brings claims against the powerful VGT on the grounds that VGT breached its oral agreements with OEM. OEM, having suffered significant financial damages because of this, now seeks both legal and equitable remedies for VGT's wrongs, including but not limited to, financial damages.

>

25

## DETAILED FACTUAL ALLEGATIONS

1    10.    PQI Corporation, located in the City of Fremont, in the County of
2   Alameda, in the State of California, is a distributor and reseller of Power Quo-
3   tient International, Inc. (PQI-Taiwan) a manufacturer of NAND Flash storage
4   devices. On February 2, 2005, a Reseller Agreement was entered into between
5
    PQI Corporation ("PQI-USA") and OEM. Among other things, this Reseller
6
7   Agreement provides the for the right to sell and distribute various flash sto-
8   rage products, which included, but was not limited to, PQI DiskOnModule®
9   (often referred to as "DOM") devices. Technically, such a device is a flash drive
10  with either 40/44 pin IDE Connector, 50 pin PCMCIA (Compact Flash,) Stan-
11  dard Universal Serial Bus, (USB 1.1 / 2.0) or 7 Pin Serial ATA Interface, (SA-
12  TA) connector.  The devices are used particularly within embedded computing
13  systems where they can often be deployed into secure areas such as airports,
14  banks and casinos. VGT's use of flash storage devices was warranted by the
15
    Data Transfer Speed, also referred to as burst rate, and the reliability of ex-
16
17  cessive read/write cycles found in solid state flash devices, opposed to me-
18  chanical rotary hard drives.  VGT uses flash storage devices in their video
19  gaming machines based on the devices proven reliability and programmable
20  security features, such as those built into the OEM devices and those distri-
21  buted by OEM manufactured by a third party. OEM enjoyed economic rela-
22  tionships with Flash Storage Device manufacturers and with VGT so as to
23  purchase from, and sell to, these entities various technological devices.

24    11.    The Reseller Agreement identified VGT as one of OEM's customers
25  with whom Power Quotient International, LLC and PQI Corporation, also

5
PLAINTIFF'S 3rd AMENDED COMPLAINT;

known as PQI-USA, agreed not to compete. It required each party to keep confidential, and not disclose or use, any confidential information provided by one to the other except as expressly permitted or for the benefit of any third party. If one was contacted by a confidential customer, the party contacted was contractually obligated to notify the other and refrain from further communications. The terms of this part of the agreement were made known to VGT by OEM. VGT acknowledged they understood the conditions and agreed to notify OEM if they were contacted by PQI-USA or other vendors selling PQI products. Plaintiff alleges that at all relevant times herein, it had as a confidential customer, VGT. Attached hereto as Exhibit "A" is a true and correct copy of said Reseller Agreement.

12. For some time, OEM sold to VGT various flash storage devices, as well as other products, manufactured by third party sources of products VGT needed for its gaming machines. Products, including flash storage devices, required they be approved by VGT hardware division prior to being sent for outside certification by an external compliance testing facility registered with the territorial regulating body. The devices are approved for testing by VGT's hardware division prior to being placed in VGT's gaming machines.

13. OEM was informed by VGT in July 2006 all future Motherboard's utilized by VGT would be configured with SATA connectors in place of IDE Connectors. OEM is informed and believes that in order to avoid "being left behind", VGT determined it needed to innovate, determined it needed to change or modify one or more of its device configurations for improved per-

formance (to access the operating software and gaming software independent of each other), allowing for better engineering capabilities, better game performance, and ultimately better profits.

14. VGT then approached OEM in July 2008, approximately two years after advising OEM of the motherboard configuration, with an offer contracting OEM for refurbishment project to upgrade systems, which OEM ultimately accepted, to conceptualize, engineer and design (2) new SATA connector configuration of flash storage devices to be purchased by VGT as a (2) piece "KIT" which meet VGT's next generation Motherboards specifications of connector configuration. On July 17, 2008, at approximately 8:36 AM, VGT contacted OEM about VGT's options for SATA flash storage devices for use in VGT's gaming machines. Based on past experience, VGT was of the impression that OEM had established relationships with flash storage device manufacturers, the requisite "know-how" or skill to design, develop, and deliver a superior device. Photographic and sketch information was exchanged, along with storage capacity needs and specific configuration details as defined by VGT including "Housings." At this time, when provided options of potential configuration, VGT's Project Hardware Development Manager, GLENN "BUTCH" MCGILL confirmed that the 2-piece "kit" would be required, as VGT wanted their operating software "OS" and gaming software "GS" to be stored on separate devices, eliminating the need to change the "OS" as frequently as they desired to change the "GS," making various machines interchangeable.

15.     In response to VGT's initial email request for a phone conference and then directed verbal inquiry regarding how OEM could support VGT's technical needs, Mr. ESTES of OEM contacted MR. MCGILL of VGT and discussed VGT's options.  VGT informed OEM the immediate quantity requirements would exceed 30,000 kits to be delivered as readily as available. During the initial conversations between OEM and VGT, VGT expressly stated they required a (2) piece "Kit" for each machine of new product configuration as well as older machines to be retrofit with an upgrade Operating Software and Gaming Software. VGT represented that if OEM could design and deliver such functioning devices or "KITs" meeting VGT's specific motherboard connector configuration, VGT would purchase them from OEM.  VGT did not identify a specific manufacturer and OEM did not specify where products would be sourced other then "Taiwan." Concerned about possible impact upon OEM's business processes with others, OEM sought assurance from VGT that VGT was not looking to others as well for this project requirement. VGT represented it was not looking elsewhere for this flash storage device requirement and had not released the project's technical requirements to any other vendor for this project. OEM explained these devices would be unique, would be OEM's proprietary design and VGT would be "single sourced" through OEM for the requested configuration. VGT assured OEM it was not an issue. OEM proceeded based on the agreement and with the understanding the quantity discussed would be awarded to OEM. VGT, acknowledging OEM to be their only supplier of SATA flash storage devices, reconfirmed OEM was VGT's sin-

1 gle source of SATA devices numerous times over several months, as the

2 project continued to move forward.

3       16.   Based upon VGT's representations and acceptance of OEM's con-

4 ditions, OEM agreed to accept the offer and begin to design and deliver the de-

5

6 vices.   Plaintiff is informed and believes and thereupon alleges that VGT

7 needed specifically-tailored devices for VGT's gaming machines as VGT's spe-

8 cific criteria were unique and technologically demanding.   Plaintiff agreed to

9 take on the project, and immediately began work on an OEM exclusive and

10 proprietary design of 1GB SATA flash storage device "KIT" designed for VGT's

11 "approved industrial motherboard (including but not limited to the "MI930 &

12 Arbor" boards). Having sent photos of the MI930 motherboard showing place-

13 ment of the SATA Connectors, VGT later sent its motherboard to OEM for use

14 during the physical housing design and device's connector configuration.

15

16 OEM supplied VGT sample units of a standard 7 pin vertical SATA flash sto-

17 rage device with a right side connector configuration. It was understood the

18 standard connector configuration did not ultimately meet VGT's specifications

19 as it did not fit VGT's motherboards connector configuration and was supplied

20 for the purpose of benchmark testing and OS/GS configuration. OEM began

21 the design and modification to a standard SATA flash storage device so it

22 would fit VGT's motherboard and other criteria specified by VGT. The modifi-

23 cations to the standard device were very extensive, including but not limited to

24 Modification in connector placement, housing configuration, power supply

25 configuration, printed circuit board "PCB" re-design and extensive engineering

1  programming features to accommodate the modifications required to meet
2  VGT's specifications.

3      17.    To get the extensive modifications started, on July 17, 2008, OEM
4  contacted a third party manufacturing source of flash storage devices regard-
5  ing OEM's new project for its confidential customer, VGT. OEM kept the client
6
7  and pricing information from its third party manufacturing source, (PQI) and
8  thus VGT's identity was not disclosed as it is confidential.  Specifically, OEM
9  explained that the confidential customer  (VGT) required SATA flash storage
10 devices be configured in a manner uniquely particular to the confidential cus-
11 tomer's (VGT's) needs (connectors that fit side by side, or the 7 Pin SATA con-
12 nector to be affixed to the end of the devices, allowing them to stand vertically
13 to fit on the Motherboard, etc.) OEM asked if this was a project the third party
14 manufacturing source (PQI) could and/or would undertake disclosing only a
15 portion of the required quantity. Contacts for the third party answered in the
16
17 affirmative.  OEM supplied its third party contacts with the technical "draft"
18 designed by OEM of the configuration approved by the confidential customer,
19 VGT.

20     18.    On July 21, 2008 in conformance with their agreement, OEM con-
21 tacted VGT regarding OEM's quote for the SATA flash storage devices as OEM
22 had shipped six (6) standard devices to VGT's hardware division in Virginia.
23 These pieces represented six (6) units of a standard 7 pin SATA flash storage
24 device with right side connector currently available through OEM product dis-
25

tribution. As to VGT's additional needs, OEM advised that there may be a minimum purchase required.

19. On August 6, 2008, VGT confirmed receipt of the standard SATA devices and stated "they are using them now for some benchmark testing on the motherboards."

20. On August 7, 2008, OEM contacted VGT purchasing manager LARRY OLIVER confirming OEM had received a request from VGT hardware to build its specialized SATA flash storage device, to include a unique connector configuration to fit the "motherboard footprint" for their gaming machines. As of this date it was understood all departments of VGT were in agreement with OEM proceeding with the design and deliver agreement. Pricing for single piece units was shared with VGT's purchasing department and it was stated by OEM "there will a cost variance for specialized DOM." Although products had already been delivered to VGT's hardware division in Virginia, VGT purchasing forwarded a Purchase Order (PO) explaining VGT has to do a PO to invoice against and asked OEM if this was OK.

21. VGT confirmed its request in having OEM design and develop the new storage device Kits and expressed interest in additional products to be supplied by OEM. On August 29, 2008, referring to flash storage devices and products in general supplied by OEM, OEM informed VGT'S manager, senior buyer and engineer, JERRY HALE, Mr. OLIVER and Mr. MCGILL, respectively, of OEM's openness to stocking and inventory programs that met VGT's special requirements in a timely fashion.

22. During the months of August, September, October, November and December, 2008, VGT requested OEM provide pricing and delivery information on additional products, manufactured by various third party sources, distributed by OEM and ultimately purchased by VGT, including various flash storage devices and synchronized random access memory modules also known as "RAMM" or "SDRAMM." SDRAMM devices supplied by OEM, of various capacity and configuration, were tested, approved and certified for use in VGT's gaming machines, usually within a few days, but taking no longer than a few weeks. Specifically 512MB PC 133 168 pin Non ECC SDRAMM was requested as part of the refurbishment project OEM was contracted to support for VGT's OS/GS upgrade. OEM was advised each motherboard utilized in the OS/GS refurbishment and upgrade project requiring SATA Kits also required (2) ea of the approved and certified OEM 512MB SDRAMM.

23. On December 02, 2008 a notice of certification from VGT's Hardware Division was sent to VGT's purchasing manager LARRY OLIVER, referring to a product distributed by OEM. A copy of the notification was forwarded to OEM as a means to describe the process of product certification. The certification referenced a 3RM Player Terminal operating on WIN32 OS using an Arbor motherboard. OEM recognized this terminal configuration to be the same as the configuration requiring the 2 piece SATA flash storage device Kits consistent with the "develop and deliver agreement" between VGT and OEM. VGT explained to OEM each terminal configuration require (2) SDRAM modules for use with the SATA flash storage Kits. The certification of the

SDRAM specified in the notification forwarded to OEM confirmed VGT's progress with the design and deliver agreement with OEM for SATA Kits and 512MB PC 133 SDRAMM.

24. OEM, in conformity with the "develop and deliver agreement," continued to design and develop the requested unique SATA storage device Kits. OEM had numerous communications with VGT's representatives regarding the development costs. VGT continued to affirm OEM no other flash storage suppliers had been provided their specifications and OEM was their chosen supplier for SATA, SDRAMM and other flash storage devices.

25. Plaintiff alleges that during October through November 2008, VGT identified their increasing need to shift from IDE protocols to SATA protocols to modernize consistent with VGT's decision to implement the SAS/Windows software upgrade and for use with the next generation motherboards. This required VGT to modify its software for use with the newer SATA technology. OEM notified VGT on November 5th, 2008 one of its Taiwan manufacturer's was having difficulties in physical engineering and programming devices that met VGT's specifications. Ultimately, Power Quotient International, LLC "PQI-TW" was unable to produce the new device kits to VGT's specifications and was unable to supply the new devices OEM had envisioned for VGT. OEM decidedly switched to another of its third party manufacturing sources for continued support of the SATA devices project. By mid to late November 2008, VGT was aware OEM had engaged another manufacturing partner to meet

1  VGT's very specific needs. VGT voiced no objection and encouraged OEM to
2  proceed.

3      26.    VGT again affirmed the design and deliver agreement by way of a
4  purchase order with OEM on December 5, 2008. Phone conversations and
5
6  email exchanges took place between OEM and VGT regarding OEM's costs in
7  manufacturing and supplying the newer version of OEM-Tech's SATA Mini de-
8  vices to VGT. VGT was specifically informed by ESTES that OEM was incur-
9  ring significant costs for this special storage device development. VGT recon-
10 firmed its agreement to purchase OEM products once completed. VGT was ad-
11 vised that by OEM accepting this project for VGT, OEM would likely forfeit its
12 ability to obtain PQI products for all of OEM's other customers – not just for
13 VGT. VGT acknowledged their commitment, and OEM was told "not to worry,"
14 establishing a significant reliance upon VGT's purchase of the products VGT
15 promised to buy from OEM as its supplier of flash storage devices.
16

17     27. On or around December 3, 2008, PQI-USA contacted OEM informing
18 OEM of a new a company venture established between TDK Corporation and
19 Power Quotient International, LLC (PQI-TW) called CoreSolid Storage ("CSS"),
20 located in Taiwan, and stated CSS had been assigned all PQI-USA business in
21 a Transfer of Business agreement detailed by PQI's Jance Lu, CEO.   OEM, as-
22 suming CSS would attempt to replace all PQI products with CSS products,
23 confirmed with its new third party manufacturing source the estimated deli-
24 very date of OEM "SATA Mini" devices for VGT.
25

28.    On or around December 5, 2008, OEM contacted VGT regarding the 1GB Prototype 2-pc "Kit" of the OEM SATA Mini device, intended to be used in place the of the previously supplied standard SATA flash storage device, advising it would be ready in about a week. VGT was more than pleased with this news, as it represented a new phase for their product development. OEM sent VGT visual samples for preliminary approval of the housings and connector configuration.    Later that same day, OEM emailed VGT and attached photos of the modified version of the 1GB SATA Mini. The email stated "working samples" of this new and unique product would be shipped within the next couple of days to VGT. OEM again reminded VGT of their mutual commitments, as OEM was expending substantial time and money to develop this product, while simultaneously being put in a position of being cut off from one of its primary manufacturers of products. (PQI)

29.    On or around December 10, 2008, OEM contacted VGT regarding the prototypes of OEM's designed and engineered 1GB SATA MINI devices specifically manufactured for VGT's gaming machines. OEM and VGT discussed specifically the costs and investment made by OEM and what OEM would incur in the future to continue to support VGT's specified requirements. OEM explained there would be additional engineering costs involved in re-programming the SATA Devices in conjunction with the Printed Circuit Board (PCB) modifications, firmware configuration and housing injection moldings to accommodate for the external housings of the SATA Mini devices required by VGT. In sharing the cost required to proceed, Plaintiff alleges VGT understood

1    the significance of this and suggested that OEM add "a buck or two" in the to-
2    tal list price that VGT was already willing to pay opposed to VGT's Hardware
3    Development team incurring a NON-Recurring Engineering (NRE) Fee at this
4    stage of the project. Based on this statement and the understanding that OEM
5    would supply the total required quantity disclosed by VGT, VGT and OEM
6    agreed OEM would continue to invest in the development of products. OEM's
7    investment recovery was reliant upon the explicit agreement that VGT would
8    continue to purchase these products from OEM as the "Single-Source" of flash
9    storage devices for VGT, which included but was not limited to SATA Mini Kits
10   and 512MB PC 133 SDRAMM utilized in conjunction with VGT's WIN32 and
11   SAS "OS/GS" upgrade and refurbishment project.

13   30.    On December 18, 2008, VGT's Mike Huber, Hardware Project
14   Manager, confirmed receipt of OEM's SATA Mini saying "I received the sample
15   Mini DOM, the packaging is great." VGT further stated it now would "be sub-
16   mitting a request for our devices/OS team to test" it and "begin the vetting
17   process," a natural step in the development process, clearly signaling OEM
18   that the agreement remained under way. VGT further represented to OEM
19   that once "the initial test has been successfully completed," VGT will "need
20   quite a few more" of the sample devices for "QA testing." Mr. HUBER stated
21   VGT would "need at least 10-15 more" of these sample devices for "testing"
22   about "mid-January." In response, OEM stated it had an obligation to submit
23   a letter of intent with its initial payment of the NRE fee OEM had agreed to in-
24   cur on behalf of VGT as part of the develop and deliver agreement.

31. On January 6, 2009, OEM contacted VGT regarding the 1GB SA-TA Mini (2) pc. Kits. OEM informed them it had five (5) "working" kits shipping to VGT for approval.

32. On January 12, 2009, OEM contacted VGT regarding VGT's planned blanket orders of the OEM devices and the initial quantities VGT required to get started. Mr. ESTES informed Mr. OLIVER that OEM would accept VGT's blanket orders and could accommodate the initial quantities discussed for SATA, SDRAMM and other flash storage devices.

33. Later that day, VGT's LARRY OLIVER contacted Mr. ESTES regarding the pricing of the devices OEM was supplying to VGT and acknowledged the agreement and requested some sort of pricing relief on these very high volumes of orders. Mr. ESTES' response to Mr. OLIVER identified each device, the corresponding purchase orders, quantity available and the per-unit prices.

34. On the delivery aspect of the agreement, Mr. ESTES informed Mr. OLIVER that OEM could offer VGT various price reductions which were specifically set forth therein. Later that evening, Mr. ESTES contacted Mr. OLIVER again and informed him he had successfully negotiated an "additional price reduction" for some of the specified devices.

35. On January 13, 2009, Mr. OLIVER of VGT contacted Mr. ESTES of OEM regarding the price reduction OEM had obtained. He stated he was pleased with the reduction of certain products and informed Mr. ESTES the information he provided on the SATA DOM Minis was "good", as Mr. OLIVER

is "usually not aware of" the pre-production work "suppliers may have been involved with in the early stages of new product development." OEM advised Larry Oliver of Technical information he was not aware of that justified the cost of the very unique devices requested by VGT's Hardware development team.

36. VGT's excitement about receiving the new OEM-designed storage device kits continued to grow. On January 13, 2009, VGT contacted OEM regarding the DOM devices it specifically manufactured for VGT. Mr. HUBER informed Mr. ESTES that he had "submitted a project within our software OS development team to ensure a seamless transition" to the new [OEM] devices. This "seamless transition" was extraordinarily important to VGT, and the importance of this cannot be overstated. It meant that in order to use the OEM-designed storage device, VGT would revise its software to function with the newer and technically advanced unique geometry of the OEM devices. Mr. HUBER reiterated he understood the OEM device geometry was unique and was different than the standard SATA flash storage device used for benchmark testing. The unique devices required a software modification by VGT that VGT ultimately engaged in and completed in order for the device "Kits" advancement through the vetting process. Each of these modifications was a step in confirming the agreement with OEM to proceed with OEM's unique device(s). The newer version of these devices represented a material performance upgrade from the standard version. The OEM device offered advanced technical options for VGT with the Operating Software and Games Software specified by

VGT which was not an option to VGT with the product used for benchmark testing. The standard SATA product used for initial testing and software pro-gramming did not allow VGT to meet its stated desired specifications as it did not allow VGT to separate operating software from gaming software as out-lined. VGT was unable to utilize two PQI devices in conjunction with its games. VGT's hardware development team confirmed two of PQI's standard SATA DOM devices did not fit their next generation motherboard connector configuration. VGT confirmed with OEM on numerous occasions its intention to replace PQI products with OEM products to meet their specifications. VGT's step in re-writing its software so it would work on OEM's new devices sent the message that VGT was well down the road to purchasing the OEM product per the agreement. Mr. HUBER requested Mr. ESTES provide "five of each of the replacement DOM's in order to ensure that our OS can be loaded and tested here", referring to all OEM-Tech products replacing PQI devices in use by VGT. VGT also requested OEM place an actual quantity of OEM's devices in inven-tory for each of the PQI DOM devices VGT then purchased from OEM. Later that same day, Mr. ESTES of OEM contacted Mr. HUBER of VGT. An email stated that although the new OEM replacement devices had been tested to function to 100% equivalence or better than the older PQI version, the SDOM utility for the OEM device had "been re-written to accommodate a firmware change removing any reference to the old manufacturer. This re-write, Mr. ESTES explained, would make it "easier" for VGT's "programmers to load the Software on the device".

1    37.    On January 16, 2009, having previously been advised CSS-TW

2    was assuming all PQI-USA business relations, OEM emailed PQI-USA's re-

3    garding the identity of OEM's clients pursuant to the Reseller Agreement. Mr.

4    ESTES provided a list of OEM's customers and the categories of products

5
     supplied to each customer. OEM specifically identified VGT as one of their
6
     customers and the products VGT received from OEM as part of the Reseller
7

8    Agreement. To maintain confidentiality, Mr. ESTES' email advised PQI-USA to

9    continue to redirect any communications from these customers to OEM in ac-

10   cordance with the "Reseller Agreement", which also identified VGT as an OEM

11   customer.

12   38.    On January 20, 2009, VGT again reaffirmed the design and deliv-

13   er agreement with OEM when it emailed OEM regarding VGT's blanket pur-

14   chase order #11106 for 40 Pin IDE DOM. VGT requested OEM release this or-

15
     der, which included 1,000 units to VGT's Tulsa office. Mr. OLIVER even
16
     thanked Mr. ESTES for "holding" the order.
17

18   39.    VGT again reaffirmed the design and deliver agreement with OEM

19   when it emailed OEM regarding VGT's blanket order #11812 outlining sche-

20   duled delivery dates of various products. The new devices requested by VGT,

21   and promised by OEM, were now available as per the agreement. On January

22   20, 2009 VGT contacted OEM saying "at this point in time, the previous SATA

23   DOM that was supplied is the only tested and approved device" VGT "can pro-

24   cure", and that they "cannot use any other SATA DOM until it has been tested

25   and approved which is generally a 4-5 week process." OEM was continuing to

fulfill its obligations under the agreement, and OEM had no reason to suspect that VGT might later attempt to repudiate this or fail to purchase the products as agreed. OEM fulfilled VGT's requirements for 512MB PC 133 SDRAMM as well as 40 Pin IDE DOM as part of the develop and deliver agreement between OEM and VGT.

40. On January 21, 2009, VGT further contacted OEM regarding VGT's intentions related to phasing out the inferior old devices. Mr. HUBER stated VGT's goal is "to approve OEM" devices and "set the PQI devices to EOL (obsolete)." OEM continued its efforts and financial investment to design and deliver the products VGT requested.

41. VGT later confirmed Mr. ESTES is "correct" that VGT is in the "process of attempting to get the SATA-Mini approved for use." VGT stated that it required engineering on VGT's end prior to the testing phase, and if the OEM devices are approved, OEM can "work out something to change the blanket order over to the new devices," again reiterating to OEM, as they had on August 17, 2008, that purchase orders used by VGT were for tracking, scheduling and receiving purposes only. Product changes, pricing changes and part number changes on open purchase orders occurred frequently with VGT's Purchasing department. On January 26, 2009, VGT confirmed that the level of importance was so high, that development of their new SATA DOM was "pushed to the top of the heap", and VGT even asked for more samples.

42. An "End of Life" or ("EOL") notice from a manufacturer is sent to advise customers when certain products will be phased out of production or

1  discontinued in the future. An End of Life, EOL date is established, usually 6-
2  9 Months from the date of the notice, with a final purchase request on or
3  around 90 days prior to the EOL release date. On February 6, 2009, OEM re-
4  ceived notice of the End of Life and did inform VGT of the EOL notice received
5  from PQI/CSS. OEM shared this information with VGT immediately so the
6
7  parties could adjust product needs and to accommodate VGT under the devel-
8  op and deliver agreement. OEM reiterated he had contracted with another
9  manufacturer to build flash storage devices to meet VGT needs for their gam-
10 ing machines. This benefited VGT, explained Mr. ESTES, because OEM had
11 negotiated the proper agreements with third party manufacturers prior to the
12 EOL notification from PQI/CSS regarding PQI products, which protected VGT
13 from any further changes in product(s) design, production modification and
14 label changes inevitably forthcoming from CSS. VGT continued to affirm the
15
16 agreement with OEM, as per Oliver's email to OEM where he says, "Chrystal
17 Ball Good," and on February 10, 2009 VGT e-mailed OEM and stated it was
18 continuing with approval testing, and again confirmed its desire to meet deli-
19 veries of their new products by March, 2009.

20      43.    On February 23, 2009, CSS-TW, referring to PQI product distribu-
21 tion, emailed OEM that CSS confirmed the "Reseller Agreement" between PQI-
22 USA and OEM dated February 3, 2005. Pursuant to a Transfer of Business
23 Statement signed by PQI's CEO Jance Lu, all PQI business had been assigned
24 to CSS. OEM requested a copy of the Transfer of Business statement, as OEM
25 had not received it prior to this email notification.

44.     On February 24, 2009, OEM contacted VGT and informed it one of OEM's Taiwan suppliers (CSS) inquired about VGT's future projections of 512MB SDRAMM, one of the devices OEM agreed to supply for VGT in conjunction with the 1GB SATA Mini develop and deliver agreement at requirements of (2) per system as defined by VGT's projections provided by VGT purchasing department, Win32/SAS upgrade Project Manager and VGT's hardware division. VGT affirmed its commitment to the develop and deliver agreement by means of a PO release forwarded to OEM on March 5, 2009, PO # 12244, for scheduled releases of 1324 pieces each of OEM part # ME0512MP33OEM, VGT part # 305-001-015 512MB PC 133 SDRAMM with deliveries to take place in March, April, May and June, 2009.

45.     On March 12, 2009 CSS-TW imposed a cost increase to OEM for purchases of PQI 1GB SATA DOM distributed to VGT. OEM notified VGT of the cost increase and stated "This increase will ONLY affect the April delivery of 880 pcs. of 304-001-020 PO 11812." VGT's LARRY OLIVER approved the cost increase and informed VGT Purchasing to update PO #11812.

46.     On March 17, 2009, CSS stated it would honor PQI's "Reseller Agreement" with OEM. CSS introduced Nick Kanamaru as CSS-USA located in Cupertino, CA and stated he was the contact for PQI/CSS related products going forward. In a letter provided by CSS-USA, CSS Confirmed OEM was the only authorized and approved USA based distributors of PQI/CSS products.

47.     On March 17, 2009, VGT's HUBER, informed VGT's OLIVER and OEM that VGT had "generated an image" for OEM's SATA DOM device, which

would be sent for "QA testing today." VGT represented it would likely pass through within a few days. These communications furthered PLAITIFF'S belief and understanding that OEM and VGT were continuing to act in conformance with the develop and deliver agreement.

48.    At or about this point in time, plaintiff is informed and believes and thereupon alleges that VGT's Purchasing Department began efforts to circumvent the Agreement between OEM and VGT. While VGT's Hardware Division was clearly advancing with the OEM developed products and did represent approval to be literally days away, Plaintiff alleges that VGT's Purchasing Manager Larry Oliver and VGT purchasing department had on-going communications with other suppliers of SATA flash storage devices contrary to VGT's commitment to OEM being VGT's single-source of SATA flash storage devices. Specifically, OEM is informed and believes the very product OEM had sourced to VGT as the product to be for used for preliminary testing only was being discussed and potentially sourced to other third party suppliers after VGT clearly acknowledged and confirmed that by OEM engaging in the develop and deliver agreement, OEM would cut itself off from source of products previously distributed to VGT obtained through PQI/CSS. Plaintiff alleges OEM's reliance upon VGT's purchase of OEM products was predominantly established at this stage of the develop and deliver agreement.

49.    On March 17, 2009, the same day VGT Hardware Division's MIKE HUBER confirmed VGT had "generated and image" on the OEM SATA Mini, a company called MagicRAM, through its sales representative, RON SOLOMON,

made direct communications to VGT (likely Corporate Officer and employee Jason Sprinkle, Hardware Division Supervisor), regarding "PQI & CoreSolid DOM & Flash Products." Like OEM, MagicRAM was previously a reseller of PQI devices through PQI-USA, and known by VGT to be a direct competitor of OEM. PQI resellers were not authorized to contact each other's customers, and VGT knew such proprietary, marketing, sales, know-how and related business information was confidential. VGT was specifically identified as one of OEM's customers in its "Reseller Agreement", and VGT knew this. VGT and MagicRAM communicated that MagicRAM offered "the complete line of PQI DOM & Flash products at very competitive pricing," and that it wanted to "start the dialogue" between MagicRAM and VGT so his company could offer VGT "the most reliable flash products" at "very competitive" prices. SOLO-MON asked Mr. SPRINKLE to let him know when the "best time to have a conference call" might be. OEM alleges MagicRam contradicted the validity of the End of Life (EOL) statement made by PQI/CSS informing VGT MagicRam were able to provide PQI products on an ongoing and unlimited basis.

50. Plaintiff alleges that VGT and MagicRAM nurtured their collaboration, as part of a plan to circumvent the agreement between OEM and VGT for the new products designed and developed by OEM, despite the time and thousands of dollars OEM consumed developing product designed to VGT's specifications and at VGT's request, and in spite of their agreement. OEM alleges the initial request for pricing and lead time information of products promised to and sourced to OEM in accordance with the develop and deliver agreement,

approved or pending certification, if not already certified by VGT's Hardware Division, Purchased by VGT's Purchasing Department, represents the breach of contractual agreement between VGT and OEM.

51. Based upon information and belief, OEM alleges that in order to further VGT's design of circumventing the oral agreement with OEM so as to save money and avoid commitments with OEM, VGT's OLIVER forwarded VGT's HUBER'S email to MagicRAM, and was suggesting they contact HUBER's immediate supervisor JASON SPRINKLE. Based upon information and belief, OEM further alleges OLIVER recommended MagicRAM introduce themselves as an alternate source of such product. OLIVER requested he not be copied on the email in order to hide his deceitful trail.

52. Again on March 17, 2009, OEM is informed and believes that SPRINKLE emailed SOLOMON regarding the manufacturing and supplying of the products MagicRAM was offering and provided MagicRam VGT's purchasing department contact information copying engineer, BUTCH MCGILL. Mr. MCGILL had been involved in VGT's discussions with OEM regarding the manufacturing and supplying of the devices MagicRAM was now trying to sell, presumably to be instead of the OEM-designed SATA flash storage device, SDRAMM and other certified devices. Since MCGILL'S request in July 2008, OEM designed and then began specifically manufacturing these devices to fit and service VGT's gaming machines per VGT's agreement to purchase them from OEM. On the very day that VGT confirmed OEM's devices were sent to QA for final approval, the final stages of VGT's internal approval process, VGT

personnel then provided SOLOMON with the email address of others at VGT, including its purchasing department, and advised him to contact them to determine whether MagicRAM met VGT's "pricing and supply requirements."

53.     On March 17, 2009, in a subsequent message to VGT's Purchasing Department, SOLOMON asked VGT's purchasing department to provide MagicRAM with the part number of "the DOM or Flash products that you are currently using with the annual quantity requirement, I will then provide you with the pricing & specifications for your review." He also requested VGT provide him with a "target price." Despite the agreement to design, develop and purchase these products from OEM, as a single source of SATA Flash Storage devices, and despite creating a significant reliance upon the future distribution of SATA Mini, 512MB SDRAMM and other flash storage devices, plaintiff is informed and believes and thereupon alleges VGT intentionally and purposefully engaged MagicRAM, a known supplier of PQI/CSS products in an effort to circumvent its obligations to and agreement with OEM. This information came directly from VGT to OEM and referred to VGT and MagicRAM, now with an eye toward VGT's eventual breach, repudiation and refusal to purchase the devices as agreed.

54.     On March 17, 2009, ESTES was forwarded messages responding to MagicRAM and received by VGT from MagicRam requesting information and further correspondence. OEM contacted CSS-USA complaining that MagicRAM had contacted VGT. CSS-USA's NICK KANAMARU informed OEM MagicRAM was not currently an authorized reseller of PQI/CSS products and was

not authorized contact VGT in an effort to sell, distribute or represent PQI/CSS products. Mr. ESTES also called MagicRAM and spoke with the sales representative who had contacted VGT, RON SOLOMON, informing him OEM had a confidential Reseller Agreement in place with CSS/PQI with a non-compete agreement as a reseller. RON SOLOMON informed Mr. ESTES he believed all customers "were open game." OEM's Charles Estes reiterated the contractual agreement identifies VGT as OEM's customer of PQI products, CSS declares MagicRAM is not an authorized reseller of PQI/CSS products and MagicRAM is not to contact VGT again. MagicRAM's Ron Solomon falsely agreed to cease communications with VGT and recognized them as an OEM-Tech customer. VGT was also advised of the conversations between OEM, CSS and MagicRAM. OEM again explained the contractual NON-Compete stipulation OEM had with PQI/CSS and explained MagicRam was not an authorized reseller of PQI products. CSS's KANAMARU later informed MR. ESTES he had also spoken with MagicRAM who agreed to cease communications with VGT. OEM is informed and believes that MagicRAM and VGT nonetheless continued to collaborate at a time that VGT knew the failure to perform, as their agreement with OEM stipulated, would be wrongful and where VGT had established for OEM such a reliance upon the purchase of products promised OEM, to circumvent the develop and deliver agreement would be extremely detrimental to OEM. Further reinforcing VGT Hardware Division's decision to move forward with OEM products in place of PQI products, and contrary to VGT Purchasing Department's actions, on March 18th, 2009 VGT's MIKE HUBER for-

1    warded OEM an email stating "We are now working on the OEM-Tech 40 and
2    44 pin units," and went on to say, "I require 10 each of these two devices for
3    development purposes."

4    55.    On March 20, 2009, OEM informed VGT's McGILL that VGT une-
5    quivocally knew that OEM had an economic relationship with CSS for PQI
6
7    products and was aware of the provisions of the reseller agreement with
8    PQI/CSS. VGT has never denied knowing this, but continued to act with com-
9    plete indifference. Later that day, MCGILL admitted that MagicRAM had again
10   contacted VGT around noon the previous day, March 19, 2009.

11   56.    On March 24, 2009, VGT contacted OEM and asked OEM to pro-
12   vide VGT with 452 additional SATA DOM devices over and above the Blanket
13   QTY order #11812. VGT stated this requirement was for new machines ship-
14   ping to its third party contract manufacturing source. OEM advised VGT's
15   Oliver that CSS-TW had again raised the cost of PQI products to OEM and
16   pushed out the Lead Time to 6 weeks, said to be due to the unavailability of
17
18   raw materials used in the PQI SATA DOM. OEM informed VGT it had the OEM
19   SATA Mini in stock and could ship immediately. The next day, VGT's OLIVER
20   told ESTES VGT would accept the "OEM version @ $46." The required quanti-
21   ty would be an additional "452" pieces and "420 of the 64MB RAM (finally)" as
22   OEM had been requested to hold this product order for VGT also. ESTES later
23   informed OLIVER he spoke with HUBER regarding the certification of OEM's
24   SATA Mini and, as further confirmation of the develop and deliver agreement,
25   HUBER stated he was working to meet the April 15th deadline he had specified

for certification. Mr. ESTES explained to Mr. OLIVER that if the certification deadline was met, consistent with the agreement, OEM could ship 880 pieces of OEM's SATA Minis to meet VGT's requested April delivery date on PO # 11812. In keeping with OEM's contractual obligations OEM shipped 1324 Pcs of the 512MB PC 133 SDRAMM on PO 12244 as part of the develop and delivery agreement to support the WIN32/SAS "OS"/"GS" upgrades.

57.  OEM continued to operate in good faith, and to deal fairly with VGT by furthering efforts to get VGT the OEM products VGT requested and agreed to purchase at the price reconfirmed by Purchasing days before. On April 15, 2009, VGT contacted OEM regarding the certification status of OEM's 1GB SATA Mini. VGT provided the same representation of said certification status as he had on March 17, 2009. VGT stated OEM's devices were still in VGT's QA testing, and that he expected approval by Friday (2 days). Once approved, VGT explained the devices would be sent to the independent lab, BMM, for lab certification. HUBER advised Mr. OLIVER and Mr. ESTES that it would take about a week for the certification letter to be released. Mr. HUBER stated OEM's 1GB SATA DOM should be approved for deployment by the end of the month. (April 2009)

58.  ESTES later contacted OLIVER regarding certification. He reminded Mr. OLIVER that with pending certification of OEM products, and as a result of previously discussed delays of PQI products, combined with CSS's EOL notice of PQI products, progressive cost increases and lengthened lead times, VGT and OEM made the right move by going with manufacturer direct

custom products. In stating "we made the right move," Mr. OLIVER responded to Mr. ESTES "No. You made the right move."

59. On April 27, 2009, OEM contacted VGT seeking affirmation everything was okay with OEM's business relationship with VGT. ESTES informed Mr. OLIVER that because of prior representations and promises by VGT, OEM was sitting on nearly $150,000.00 in inventory waiting for certification of its new devices and this caused him concern. OLIVER responded in an email to OEM saying, "Take a Valium." Inquiry was made about working with other sources. OLIVER did not deny the past representations, did not deny the agreement to purchase the thousands of pieces of product, and purposefully refused to disclose whether he or others at VGT were secretly working with MagicRAM, CSS-USA (or others) to circumvent the OEM-VGT agreement.

60. Plaintiff alleges that OLIVER falsely indicated VGT was going to continue with the agreement, and in particular responded that there was nothing for Mr. ESTES to be concerned about. Thus, VGT continued to falsely confirm VGT would honor the agreement with OEM as Mr. OLIVER responded the plan has and was for VGT to use OEM's devices. Mr. ESTES responded he would ship OEM's devices to VGT immediately. Mr. OLIVER responded by asking if they had been approved yet. OEM understood the devices had been internally "approved" by VGT's Hardware division and the pending certification was for the purpose of deployment in the field with VGT's "OS and "GS." Internal approval meant VGT could accept product delivery at any time. OEM understood VGT withholding OEM products was a tactic used by OLIVER in the

past to seek deeper cost reductions and avoid the gaming giant, VGT, from carrying monthly inventory levels for as long as suppliers were willing to warehouse VGT's purchased stock pending releases by OLIVER. OEM had previously agreed to stocking agreements, however VGT had hadn't contacted and engaged in communications with others suppliers, when stocking agreements were discussed. OEM alleges, as was done in December 2008, VGT, in effect, reinforced OEM's reliance upon VGT to perform its obligations as part of the develop and deliver agreement by intentionally causing delay of product certification and release of products requested just weeks before. VGT had also not cancelled any of its previous requested products from OEM however on April 8, 2009 VGT's OLIVER wrote OEM claiming an error in requirements discovered by VGT caused OLIVER to cancel PO 12424 for (420) Pcs of 64MB SDRAMM. VGT did not schedule any further releases of this product with OEM thereafter. OEM believes and therefore alleges this product was sourced to a third party or alternate supplier and as was OLIVER's intentions with all products previously distributed by OEM.

61. Desiring at this stage to reduce inventory levels and minimize its reliance upon VGT, on or about April 28th OEM contacted VGT's LARRY OLIVER and asked him if HUBER of VGT had an update on the certification of OEM's devices. OLIVER and ESTES continued to discuss the benefits to VGT of having OEM-SATA Mini shipped to VGT's Tulsa, Oklahoma office for immediate transfer of products when the certification of OEM products was released "No later than the end of the month." Mr. OLIVER agreed having products in

Tulsa would make the transition seamless for VGT and authorized the release of the delayed April and pending May 15th shipments of OEM SATA Mini devices equaling 1770 pieces on blanket order #11812 and 452 pcs. on PO .

62.    On or about May 7, 2009, OEM informed VGT it was traveling to OEM's manufacturer in Taiwan, and OEM would invest additional capital toward manufacturing of product requirements for VGT, and that OEM would make higher volume purchases of inventory to meet VGT's quarterly requirements in order to obtain cost reductions. VGT remained silent on the issue of purchase, yet ESTES asked OLIVER for VGT's projections for the following devices: (a) 256MB 40 Pin IDE DOM (P/N 304-001-015); (b) 1GB SATA DOM (P/N 304-001-020); (c) 512MB SDRAM (P/N 305-001-015) and (d) 256MB 44 Pin IDE Secured DOM. VGT was told this would assist OEM in determining the amount of inventory OEM could stock up to support VGT's needs.

63.    On or about May 7, 2009, Mr. OLIVER contacted Mr. ESTES and VGT purchasing agent HYPNAR regarding VGT's projections for 2009 with OEM. Despite being in communications with MagicRAM, OLIVER encouraged OEM to continue its efforts to develop and provide the new OEM devices and informed them OEM's SATA was in "Final QA for Field approval". All along at this point, OEM suspected VGT planned to continue purchasing the PQI flash storage devices previously determined to be for testing purposes only and did not meet VGT's ultimate goal or specifications for product upgrades. OEM suspected VGT planned to purchase PQI products from third party suppliers to negotiate for cost reductions of products, while knowingly circumventing

the design and deliver agreement with OEM after agreeing OEM would be VGT's supplier of SATA Flash Storage Devices, 512MB PC 133 SDRAMM and other products distributed by OEM.

64.    As time continued to pass with no apparent certification of the OEM-Tech SATA Mini, OEM began to wonder whether VGT was going to re-nege on its contract with OEM and whether it was now trying to avoid its commitment. On or about May 7, 2009, ESTES contacted OLIVER and HYP-NAR about OEM's part, 1GB SATA DOM (P/N 304-001-020 / 304-001-025). He expressed his concern VGT may be looking at other sources. OEM had shipped, and VGT accepted, two shipments of 880 pieces each of the parts they manufactured specifically for VGT's motherboard, yet the device was still mysteriously uncertified, according to OLIVER.  OLIVER said nothing about products shipping to or being received in Tulsa, OK on May 5, 2009, though he had authorized the release of products in late April.

65.    On May 19, 2009, VGT's hardware division manager, MIKE HU-BER, informed OEM that he was finalizing the documentation for the certifica-tion of the OEM 1GB SATA Mini.  HUBER requested again part numbers for the OEM SATA Mini and added "if you could send me the part numbers for the 40 and 44 pin DOMs as well that would be great." This was further confirma-tion that VGT's Hardware Division was moving forward with replacing PQI parts with OEM parts.

66. On May 20, 2009, VGT's MIKE HUBER requested OEM ship (8) 1GB OEM SATA Mini and (4) OEM 256MB 40 pin IDE flash storage devices for im-

1  mediate turn around to VGT's outside Compliance Testing Lab, BMM located
2  in Las Vegas. VGT sent OEM Purchase Order # 12495 for (8) pieces of OEM
3  SATA Mini, part number SAT0010GFSD-R, (VGT part number 304-010-025)
4  and OEM 256MB 40 Pin IDE OEM part number IND0256MFSD (VGT part
5  number 301-001-015) to be shipped UPS OVERNIGHT EXPRESS to VGT's
6  Hardware Division in Virginia.
7

8  67. On May 21, 2009, ESTES informed HUBER he had shipped more
9  of OEM's SATA Mini flash storage devices to VGT's Ruckersville office as re-
10 quested. HUBER confirmed The SATA Mini devices had been received, loaded
11 with the new software, and were being packaged for shipment to Las Vegas
12 that same day, which represents territorial certification for Class III gaming
13 customers. OEM assumed at this point that certification for Class II games
14 must have been achieved. HUBER advised certification would be no later than
15 June 2, 2009.
16

17 68. On May 21, 2009, the same day OEM was advised of devices being
18 loaded and shipped to BMM for final certification, VGT's JERRY HALE con-
19 tacted OEM requesting (300) Pieces of 44 Pin IDE Secured flash storage devic-
20 es. HALE issued PO # 12955 using OEM part number SEC0256MFSD Rev A
21 (VGT's part number 304-001-010). HALE requested OEM ship as many as
22 possible, as soon as possible, as VGT's production department in Tulsa, had
23 run out of products required to make month's end shipments. OEM, knowing
24 this would not look good for Purchasing Manager LARRY OLIVER shipped 56
25 pieces to be delivered on June 10, 2010. OEM felt confident VGT Hardware

Division's HUBER, VGT Supply Chain Manager JERRY HALE and WIN32/SAS Project Manager BUTCH MCGILL were all actively engaged in business relations with OEM as part of the develop and deliver agreement recognizing OEM as VGT's source for Flash Storage Devices.

69. On May 22, 2009 at 8:33 AM VGT's Purchasing Manager LARRY OLIVER wrote to OEM saying, "I am not in the office today but have seen e-mails this week asking if un-approved OEM 1 GB SATA has been shipped to OK? Yes-No?" OLIVER went on to say "I know Jerry was calling you late yesterday also about PQI availability due to our sliding approval dates on the OEM product." The products referred to OLIVER were different part numbers and configuration then those HALE was requesting. OEM alleges VGT's OLIVER was trying to cover for running out of products by making note of the sliding approval dates of totally unrelated products.

70. Though VGT's Hardware Division was outwardly showing signs of conforming to the agreement, others, particularly Mr. OLIVER, now showed signs of repudiation. On May 22, 2009, VGT's OLIVER advised OEM not to ship any more OEM devices until OEM received written approval from VGT hardware and purchasing divisions. As previously discussed with OLIVER, Mr. ESTES responded "It is my understanding from conversation with Mike Huber that there are approx 200 pcs in stock in OK to satisfy current demand until the certification is complete on June 2nd. At which time the inventory is in place to switch and continue production uninterrupted as scheduled."

71. OEM is informed and believes and thereupon alleges that VGT submitted the OEM devices to the independent testing lab, BMM, on May 21, 2009. VGT confirmed this and now represented that certification would be

completed by June 2, 2009. VGT's OLIVER released shipments of OEM 1GB SATA Mini, then while out of the office on vacation, denied doing so in the face of adversity with other VGT departments and VGT supervisors.

72. On May 26, 2009, referring to Blanket Order #11812 modified on March 12, 2009, OLIVER wrote to VGT's BRIAN HYPNAR accepting the cost reduction of the OEM devices shipped to Tulsa telling HYNAR to "correct the modified PO # 11812 back to original form." He went on to say, "The cost difference is/was a small issue compared to non-approved material being shipped." OLIVER continues to deny releasing shipments of OEM 1GB SATA flash storage devices to VGT's Tulsa, OK facility.

73. Plaintiff is informed and believes and thus alleges that VGT continued to act in other ways which suggested VGT desired to avoid its obligations under the agreements with OEM. For example, on May 27, 2009, VGT's OLIVER contacted OEM and advised that OEM's shipment of unapproved SATA DOMs made OLIVER "look bad" because he did not admit to his superiors he authorized product release of OEM products, denying his earlier release of devices, and approving the OEM version in March, releasing shipments of OEM products for April and May scheduled deliveries of PO #11812. OLIVER had previously indicated he would "burn" those who make him look bad, as he had done with others.

74. On June 8, 2009, OEM again asked about certification of OEM products, and whether there was any problem shipping the last 1,760 parts OEM had in stock. For the first time, and without explanation or reason,

OLIVER informed ESTES that all of VGT's purchase orders for OEM SATA DOM were "on hold", that OEM should not ship any product and oddly stated there was no firm timeline for final certification.

75. Upon information and belief, OEM alleges VGT's OLIVER placed VGT orders of OEM devices on hold because it wanted to further the development with MagicRAM, and because ESTES had made him "look bad." OEM believes and therefore alleges OLIVER's allowing VGT to run short of products, denial of product releases from OEM and release of unauthorized products, although days away from final certification, is what made OLIVER look bad. OLIVER had previously stated he would burn any supplier going behind his back or making him look bad. OEM believes and alleges OLIVER was intent on sabotaging the develop and deliver agreement between OEM and VGT for OEM-SATA Mini, 512MB PC 133 SDRAMM and other flash storage devices.

76. On June 11, 2009, VGT's hardware division contacted OEM and for the first time stated the external testing labs were having "an issue" reading the "Signature" loaded on the OEM's SATA Mini device. On June 10th OEM received a voice message from a Testing Lab Technician named BRIAN STOKES of Eclipse Compliance Testing located in Solon, Ohio. MR. STOKES requested MR ESTES call him back regarding products supplied by VGT for compliance testing and certification. ESTES contacted MR STOKES at the number provided and assisted by helping the external lab work through the proper "Re-Boot Cycle" of OEM's SATA flash storage device which allowed them to confirm the Signature verification of VGT's software loaded on the

OEM device. It was a relatively straight forward solution. Mr. ESTES confirmed with BRIAN STOKES of Eclipse Compliance' testing of OEM SATA Mini flash storage device confirming the SATA Mini were certified and a Letter of Certification would be released that day by the lab chosen by VGT for certification of the OEM storage devices. Further, Mr. STOKES confirmed a certification letter had previously been sent to VGT for OEM's other devices, and reiterated the Certification letter for the OEM SATA Mini would be released that day. Mr. STOKES also confirmed that he had received additional PQI devices and another supplier's device from VGT. Upon information and belief, Mr. ESTES alleges the other supplier was MagicRAM. OEM now believes and therefore alleges that MagicRAM was supplying parts to VGT at VGT's request.

77. Soon thereafter, VGT implemented the next element of its covert plan to avoid its agreements and obligations with OEM. VGT's OLIVER now feigned he was upset with OEM's profit margins, which profit margins were irrelevant. He claimed he knew what OEM was going to make on the agreement with VGT, and was now suggesting that the profit for OEM was somehow wrong. Upon information and belief, plaintiff alleges VGT obtained specific information related to OEM's profit margins from CSS, CSS-USA or MagicRAM, and did so under circumstances where VGT either knew, or under the circumstances, should have known that such information was confidential.

78. On June 12, 2009, OEM informed VGT's HALE, MCGILL and OLIVER that sources telling VGT that PQI products are available and less expensive, and suggested the EOL notice was somehow false was inaccurate.

ESTES explained OEM did not make any misrepresentations regarding the EOL notification, and reminded VGT that VGT made the original decision to switch from PQI products to OEM products, that VGT wanted new and improved products, That PQI SATA devices used for testing and evaluation purposes only had previously been determined to meet VGT's specifications proved OEM for the desired SATA devices intended for the WIN32/SAS "O/S, G/S" upgrade project, that VGT promised to purchase OEM's new devices if delivered and certified. ESTES reiterated that, based on VGT's offer, OEM had designed a new product, had spent considerable efforts and money developing a product at VGT's request, had switched suppliers from PQI to a third party supplier to support their specific requirements, and had in fact delivered a certified flash storage device to meet VGT's highly unique specifications. When OEM agreed to develop the SATA Mini Flash Storage Device to meet VGT's specifications it was understood at the time no other supplier could meet VGT's detailed specifications nor were any other suppliers provided with VGT's specifications or sourced for VGT's total requirements of SATA Flash Storage Devices. It was understood that PQI SATA devices were used for the purpose of Testing and software configuration and did not meet VGT's desired specifications. It was agreed OEM would be VGT's "Single- Source" supplier of SATA Flash Storage Devices. When OEM agreed to switch, ESTES reminded VGT that OEM would be dissolving a long-standing relationship with its current supplier, in effect cutting OEM off from future product distribution in order to supply the product VGT had requested from OEM thus VGT created reliance

upon the total quantity disclosed to OEM if OEM engaged in the WIN32/SAS project in support of VGT. The EOL situation was, at best, peripheral to the design and deliver agreement of OEM to supply VGT with SATA devices, SDRAMM and other flash storage devices.

79.     OEM is informed and believes and thus alleges that its devices were satisfactorily approved for use in VGT's systems by VGT's hardware division, and external certification of those devices was subsequent to VGT's internal approval, meaning VGT could put devices in service at any point they desired and most likely did so in June, July, August and Septemeber 2009. Despite such approval, VGT wrongfully and falsely represented that in fact the devices were not approved, not certified, and in an effort to further its plan of using a third party source such as MagicRAM, CSS, PQI-USA, or other source. OEM now is informed and believes that its device was in fact certified for use. VGT had represented that OEM's devices would be certified no later than mid-April 2009. OEM had no way of actually knowing the release of notification of product certification of their devices would be delayed by VGT itself, if indeed certification was delayed at all. VGT knew that OEM's design for VGT had a new software imprint, a unique geometry configuration, had a new hardware design and is a much better product then those it replaced meeting VGT's specifications of design. However, OEM is informed and believes that VGT, in order to get other devices cheaper, circumvented the design and deliver agreement with OEM by developing a relationship with MagicRAM or other third parties. OEM requested VGT inform him if VGT had been actively seek-

ing other sources while OEM developed and held inventory of 1GB SATA Mini to cover VGT's demand. OEM believes VGT had an obligation to notify OEM of any contact with other suppliers of Flash Storage Devices. Mr. ESTES asked VGT to be forthright if they had placed the certification release on hold of OEM products because they had found a source of cheaper products.

80. On information and belief, plaintiff alleges that on or about June 22, 2009, VGT falsely represented to OEM it had not heard anything on the results of the testing of OEM's devices for its gaming machines. Yet OEM had already been informed eleven (11) days earlier by Eclipse Testing the OEM devices had been approved, certified and Letters of Certifications had been or would be sent as of June 10, 2009. On June 25, 2009, during a conference call between OEM's MR. ESTES and VGT's JERRY HALE, BUTCH MCGILL and LARRY OLIVER, MR Estes pointedly asked VGT if they were buying Flash Storage Devices from an alternate supplier. VGT's LARRY OLIVER responded "That's none of your business." MR MCGILL affirming the Develop and Design agreement with OEM stated, VGT still wants to use the OEM version of the SATA Flash Storage Devices.

81. Thereafter, VGT failed and refused to honor their agreements to purchase the specialized products OEM designed, produced and delivered or tendered.

82. Plaintiff alleges that it reasonably relied upon months of promises and representations that VGT would honor the agreement to purchase over 30,000 2-piece "kits" from OEM as a "Single-Source" supplier, of SATA Flash

Storage Devices and 512MB PC 133 SDRAMM. But for the representations and promises by VGT, OEM would not have acted as alleged herein or devoted hundreds of hours and thousands of dollars into developing a new device "Kit" for VGT to profit with, while simultaneously cutting off its supply of products for its other customers.

83. OEM alleges it dutifully performed any and all obligations it had under the design and deliver agreement. Despite the fact that OEM has performed any and all conditions, covenants and promises in the oral agreements, VGT has failed in its obligations, and has failed and refused to honor its agreements. VGT knew in advance that developing the devices VGT requested would eventually sever OEM's ability to obtain other products from PQI/CSS, and would be unable to serve the needs of other customers of OEM thus creating a significant reliance upon VGT to perform as agreed. Not fulfilling its part of the develop and deliver agreement was known by VGT to cause foreseeable but irreparable detriment and harm to OEM, and that it could even destroy OEM and its ability to employ individuals, shutting down operations.

84. As a direct and proximate result of the facts above, VGT breached the agreement with OEM, breached the covenant of good faith and fair dealing, all to its damages. In the process VGT wrongfully and intentionally caused general and consequential damages to OEM. In circumventing the develop and deliver agreement, OEM has consequential damages as a result of products certified and progressively purchased by VGT during 2009 while VGT's OLIV-

ER sabotaged the relations between OEM and VGT. VGT, by and through its agents, has unequivocally stated it refuses to deal with OEM, refuses to purchase the products specially developed at its behest, and thus has in bad faith repudiated the contract made with OEM, all to the detriment and damage of OEM. On or around September, 2009, during a conversation between VGT and OEM, VGT's BUTCH MCGILL informed MR.ESTES "VGT just decided to go in a different direction." stating "they no longer determined the parts to be mission critical," all to the detriment and harm of OEM.

## FIRST CAUSE OF ACTION

### (Breach of Oral Contract
### As Against Video Gaming Technologies, Inc.
### And DOES 1 to 50)

85.    Plaintiff hereby incorporates the above allegations by reference as if set forth fully herein.

86.    Plaintiff alleges that, based upon the comprehensive set of facts set forth in detail above, VGT made an offer to OEM, which OEM accepted, based upon valid consideration. The offer was that, given the unique desire and needs of VGT for new and more sophisticated flash storage devices (referred to as the SATA, SDRAMM and Flash Storage Devices), if OEM could design and deliver such devices, at OEM's expense equal to $60,000, VGT would exclusively purchase from OEM over 30,000 2-piece kits of 1GB 7 Pin

SATA Flash Storage devices at $92.00 per kit and approx. 60,000 units of 512MB PC 133 SDRAMM at $38.50 per unit as part of the WIN32/SAS upgrade of products and new product releases as each system utilizing (2) pieces of 1GB SATA Mini also utilizes (2) Pieces of 512MB SDRAMM certified by VGT for purchase from OEM. OEM agreed to design, develop and deliver said devices, and in fact, was successful in delivering over 3700 functioning and ultimately certified flash storage devices as particularized by VGT before VGT reneged on the delivery agreement in process with OEM.

87.    Plaintiff is informed and believes, and thus alleges that at some point in time which is not precisely known, but believed to be approximately April or May, 2009, for financial profit and related reasons, as well as personal reasons, VGT, by and through its officers and managing agents, made the decision to renege on the agreements it had made with OEM. In particular, VGT, failed and refused to perform its obligations, and instead purposefully utilized the services of a known competitor, MagicRAM, or some other third party to obtain alternative, albeit inferior products, for testing, approval, certification and delivery to Defendant although the defendant had previously determined the PQI products supplied by MagicRAM did not meet their specifications.

88.    As a direct and proximate result of the acts and/or omissions of defendants and each of them, plaintiff has suffered both monetary and irreparable damages and harm. Defendants, and each of them, breached the agreement herein described and by having done so in bad faith and not in a

way so as to deal fairly with plaintiff, thus depriving plaintiff with the anticipated and foreseeable benefits of the bargain.

90. Plaintiff alleges it has performed any and all of its obligations under the agreements alleged herein, except as to those obligations which were discharged or otherwise excused. Plaintiff has requested that defendants perform under the agreements but this has been denied.

91. Plaintiff has thus suffered monetary and irreparable damages according to proof at the time of trial, but alleged to be in excess of the minimum of this court's jurisdiction.

## SECOND CAUSE OF ACTION

### Breach of the Covenant of Good Faith

### And Fair Dealing Against All Defendants

92. Plaintiff hereby incorporates the above allegations by reference as if set forth fully herein.

93. Plaintiff alleges that VGT, and DOES 1 to 50, and each of them, made representations to OEM as to the benefits that OEM could obtain by entering into the develop and deliver agreement with VGT utilizing OEM's new flash storage devices. As a result of representations made, plaintiff and defendants engaged in more detailed discussions, which, among many other things, included representations as to specific benefits of the bargain including profits to OEM.

94. As more fully alleged above, the defendants represented that if OEM agreed to develop the product VGT needed, VGT would honor the develop and deliver agreement, acknowledging that OEM would be VGT's "Single Source" of SATA Flash Storage Devices among other Flash Storage devices supplied by OEM and OEM would enjoy the benefits expected of such a relationship including but not limited to profits. OEM accepted this offer, and performed all of the conditions and requirements under the agreement.

95. Unknown to plaintiff, defendant VGT ultimately decided to renege, breach and repudiate such agreements in the name of profit for itself, and for harm, detriment and damages to OEM. By so doing, VGT wrongfully deprived OEM of its reasonably anticipated benefit of the bargain that OEM expected, including the realization of sales and profits with VGT. Instead, VGT acted in bad faith, and failed to deal fairly with OEM. It breached the agreement to accept and purchase from OEM approximately 30,000 "kits" of the OEM SATA flash storage device OEM part # SAT0010GFSD-R (right) and SAT0010GFSD-L (left), for which OEM expended considerable time and money designing, developing and delivering. Consequential to reneging on the develop and deliver agreement, VGT caused consequential collateral damages of loss revenues promised OEM of 60,000 pieces of 512MB PC 133 SDRAMM OEM part # ME0512M33OEM which VGT certified in December 2008 and VGT did purchase from OEM from January 2009 through September 2009 until repudiating the develop and deliver agreement. But for the breach of the covenant of good faith and fair dealing, OEM would not have entered into the agreements,

1    would not have jeopardized the existing economic relations OEM enjoyed with

2    others, and would not have expended the time and money it devoted to de-

3    sign and deliver the device VGT requested and desperately wanted for prod-

4    uct enhancement and increased profit.

5

6    96.   Plaintiff OEM performed each and every obligation and covenant

7    under these agreements, but defendant did not. Defendant had an implied

8    duty of good faith and fair dealing implied in the agreements so as not to pre-

9    vent plaintiff from obtaining the benefit of the bargained for exchange, yet as

10   a direct and proximate result of the acts of defendant, OEM was harmed and

11   damaged in an amount to be proven at the time of trial. By making the false

12   representations to the plaintiff, by concealing the true facts, and by remain-

13   ing silent while incomplete or false information was given or promis-

14   es/representations were made and when specifically requested VGT respond-

15   ed, "that's none of your business," defendants interfered with plaintiff's legi-

16   timate right to receive the benefits of the purchase Contract. Defendant later

17

18   and well after the demise of the develop and deliver agreement, did advise

19   OEM, VGT simply went in a different direction and advised OEM the parts he

20   had designed, developed and expended tremendous effort and expenses into,

21   was no longer "mission critical."

22   >

23   >

24                        **THIRD CAUSE OF ACTION**

25                           **Detrimental Reliance**

97.  Plaintiff hereby incorporates the above allegations by reference as if set forth fully herein.

98.  Plaintiff alleges that VGT, and DOES 1 to 50, and each of them, made representations to OEM as to the benefits that OEM could obtain by entering into the develop and deliver agreement for VGT's new flash storage devices.  As a result of representations made, plaintiff and defendants engaged in more detailed discussions, which, among many other things, included representations as to specific benefits of the bargain.

99.  As more fully alleged above, the defendants represented that if OEM agreed to design the product VGT needed, VGT would honor the design and deliver agreement, acknowledging that OEM would be VGT's supplier of SATA Flash Storage Devices, 512MB PC 133 SDRAMM and other Flash Storage devices supplied by OEM and OEM would enjoy the benefits expected of such a relationship. OEM accepted this offer, and performed all of the conditions and requirements under the agreement.

100.  Unknown to plaintiff, defendant VGT ultimately decided to renege, breach and repudiate such agreements in the name of profit for itself, and for harm, detriment and damages to OEM. By so doing, VGT wrongfully deprived OEM of its reasonably anticipated benefit of the bargain that OEM expected, including the realization of sales and profits with VGT.  VGT created a reliance upon which OEM was dependant, having exhausted its financial holdings in support of VGT's request for product development to support the de-

velop and deliver agreement. Instead, VGT acted in bad faith, and failed to deal fairly with OEM resulting in extreme detriment to OEM. VGT breached the agreement to accept and purchase exclusively from OEM approximately 30,000 "kits" of the OEM SATA Mini flash storage device and 60,000 pieces of 512MB PC 133 SDRAMM, both utilized in conjunction with the WIN32/SAS Project "O.S./G.S." upgrade for which OEM expended considerable time and money designing, developing and delivering and VGT did accept delivery of, Approve for use and did have Certified by an external compliance test facility chosen by VGT. But for the reliance of financial recovery promised OEM in VGT saying "add a buck or two to the total quantity" to be sourced to OEM, a reliance was created by VGT through the develop and deliver agreement. Had it not been for the promised total quantity promise of several products awarded OEM as part of the develop and deliver agreement, OEM would not have entered into the agreements, would not have jeopardized the existing economic relations OEM enjoyed with others, and would not have expended the time and money it devoted to design, develop and deliver the devices VGT requested and so desperately wanted product upgrade resulting in increased profit.

101. Plaintiff OEM performed each and every obligation and covenant under these agreements, but defendant did not. Defendant had an obligation to release OEM from its reliance to the develop and deliver agreement, however when asked if VGT was seeking alternate suppliers, VGT responded "that's none of your business," and reaffirmed the reliance of product development

1  by affirming further its intent to proceed with the develop and deliver agree-

2  ment, yet as a direct and proximate result of the acts of defendant, OEM was

3  harmed and damaged in an amount to be proven at the time of trial. By mak-

4  ing the false representations to the plaintiff, by concealing the true facts, and

5  by remaining silent while incomplete or false information was given or prom-

6

7  ises/representations were made, defendants interfered with plaintiff's legiti-

8  mate right to receive the benefits of the purchase contract and develop and

9  deliver agreement.

10

11  **PRAYER FOR RELIEF**

12  WHEREFORE, Plaintiff prays for judgment as follows:

13  **First Cause of Action**

14  1. For compensatory, consequential and general damages;

15  2. For costs of suit herein and pre-judgment and post-judgment in-

16

17  terest; and

18  3. For such other and further relief as the Court may deem just and

19  equitable.

20

21  **Second Cause of Action**

22  1. A decree that the above acts of defendants were, and are, unfair acts

23  of competition in violation of _Business & Professions Code section 17200_;

24

25

2.   Temporary and permanent orders enjoining defendants from de-stroying or disposing of any documents memorializing any part of defendant's information pursuant action brought by Plaintiff.

3. Pursuant to Business and Professions Code section 17203 and pur-suant to the equitable powers of the court, Judgment for damages of profits or equitable advantage realized by means of any practice determined to consti-tute unfair dealings and unfair business practices.

4. For an award of collateral damages caused by defendant's unfair dealings with the Plaintiff as a result of the unfair dealings and unfair busi-ness practices;

5. For an award of recovery of reasonable Attorney's fees paid by Plain-tiff in the preliminary stages,

5.   For such other and further relief as the Court may deem just and equitable,

>

**Third Cause of Action**

1. For compensatory, consequential and general damages;

2. For an award of consequential damages caused by defendant's
   creation of a reliance resulting in undetermined detriment and
   harm for which financial compensation alone may not fully
   repay.; AND

3. For such other and further relief as the Court may deem just and
   equitable

1

2 Dated: February 1, 2011,          CHARLES R. ESTES, PRO-SE
                                    b.d.a. OEM-TECH a California Sole
3                                   Proprietorship.

4

5                                   By:

6                                       CHARLES R. ESTES

7

8

9                        **JURY TRIAL DEMAND**

10
      Plaintiff hereby demands a trial by jury.
11

12
   Dated: February 1, 2011          CHARLES R. ESTES, PRO-SE
13                                   d.b.a. OEM-TECH a California Sole
                                     Proprietorship.;
14

15                                  By:

16                                      CHARLES R. ESTES, PRO-SE

17

18

19

20

21

22

23

24

25

1 | **PROOF OF SERVICE**

2 | Case name:   Charles R. Estes d.b.a. OEM-Tech Vs. Video Gaming Technologies, Inc.

3 | Case number:   3:10 cv 04368 – RS

4 |

5 | On the date shown below, I, **Charles R. Estes, d.b.a. OEM-Tech a California Sole**

6 | **Proprietorship**, served the following document(s): 3rd Amended Complaint, w/ request for Jury

7 | Trial.

8 |

9 | _____

10 | I served the documents by the following method(s): *[Check all that apply.]*

11 | **XX** FAX. The document(s) listed above were transmitted to the fax number(s) set

12 | forth below, or as stated on the attached service list, on this date before 5:00 p.m.

13 | ☐ U.S. MAIL. The document(s) listed above were placed in a sealed envelope with

14 | postage thereon fully prepaid, in the United States mail, addressed as set forth below.

15 | ☐ PERSONAL DELIVERY. The document(s) listed above were delivered

16 | personally to the persons at the addresses set forth below by   N/A

17 | _____.

18 | **XX** EXPRESS MAIL. The document(s) listed above were caused to be sent by

19 | Federal Express/Express Mail.

20 | Recipients' Names and Addresses or Fax Numbers: Counsel for the Defense_____

21 | _____*Andrew W. Stroud, Lead Counsel*

22 | *Landon D. Bailey,*

23 | *Mennemeier, Glassman and Stroud, LLP*

24 | *980 9th Street # 1700*

25 | *Sacramento, CA 95814*

26 | *Ph: 916-553-4000   Fax: 916-553-4011  Stroud@MGLaw.com*

27 |

filing Copy

1  Certificate

2

3  I declare under penalty of perjury under the laws of the United States of America that the

4  foregoing is true and correct.

5

6  Executed on ___February 1, 2011 at Hill, New Hampshire.

7

8  Signature: _____

9

10  Printed name: Charles R. Estes, Pro-SE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*filing Copy*

PROOF OF SERVICE, 3:10 cv 04368-RS 3rd Amended Complaint, PAGE 2 OF 2

## Charles Estes

**From:** "Landon Bailey" <lbailey@mgslaw.com>
**Date:** Thursday, January 27, 2011 3:07 PM
**To:** "'Charles Estes'" <CharlesEstes@OEM-Tech.com>
**Subject:** VGT/OEM - Third Amended Complaint

Mr. Estes –

This will confirm that we do not object to you filing a Third Amended Complaint to cure the deficiencies in the Second Amended Complaint as previously discussed. Of course, we reserve all rights and remedies with regard to any deficiencies in the Third Amended Complaint.

Thank you,
Landon

Landon D. Bailey
Mennemeier, Glassman & Stroud, LLP
980 9th Street, Suite 1700
Sacramento, CA 95814
Direct: (916) 551-2588
Fax: (916) 553-4011
Email: lbailey@mgslaw.com

for filing

2/1/2011